IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICHARD S. AURAND,                    )
                                      )
            Plaintiff,                )
                                      )
                                      )   No. 14 C 3986
vs.                                   )
                                      )   Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Richard S. Aurand filed a motion for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Sections 216, 223, and 1614 of the Social Security Act (docs. # 12, 13). The Commissioner filed her own motion seeking affirmance of the decision denying benefits (docs. # 18, 19). For the following reasons, we deny Mr. Aurand's motion and grant the Commissioner's motion.

### I.

We begin with the procedural history of this case. Mr. Aurand applied for DIB and SSI on November 14, 2011, alleging that he became disabled on February 16, 2011 as a result of his various disabilities, which include cognitive deficits, bipolar disorder, and scar tissue from burns

---

[1] On August 14, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

on his face, neck, back, chest, hands, and ears (R. 180, 208). The application was denied initially on March 28, 2012, and upon reconsideration on July 12, 2012 (R. 130-33, 135-37). On timely request, a hearing was held before Administrative Law Judge ("ALJ") Victoria A. Ferrer on November 9, 2012 (R. 38-120). The ALJ issued an unfavorable decision on November 30, 2012, finding that Mr. Aurand is not disabled but rather is capable of light, unskilled work with certain modifications (R. 20-32). The Appeals Council then denied Mr. Aurand's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We proceed with a summary of the administrative record. Part A briefly sets forth Mr. Aurand's background, followed by his medical record in Part B. Part C discusses the testimony provided at the hearing before the ALJ, and Part D sets forth the ALJ's written opinion.

## A.

Mr. Aurand was born on October 26, 1961, and has a high school education (R. 164, 209). He is unmarried, has no children, and lives in an apartment with his step-mother (R. 215). Between 1984 and 2007, Mr. Aurand worked as a millwright for an automotive business (R. 209). He has not engaged in significant gainful activity ("SGA") since he quit that job in late 2007 to care for his ailing father. In June 2008, during a night of drinking, Mr. Aurand became despondent about his unemployment and attempted suicide by setting himself on fire. Following several years of recovery, Mr. Aurand worked for approximately 10 weeks during the summer of 2012, which is after his alleged disability onset date of February 16, 2011 (R. 571). Today, Mr. Aurand suffers from mental health problems and the physical consequences of his suicide attempt.

2

**B.**

The relevant medical record begins on June 21, 2008, when Mr. Aurand arrived at The University of Chicago Medical Center for treatment of self-inflicted third degree burns to his face, neck, upper torso, and hands (R. 379). Much of the medical record pertains to Mr. Aurand's month-long hospital stay subsequent to this injury, which involved many trips to the operating room for burn debridement, skin grafts, implantation and re-adjustment of feeding tubes, insertion of a tracheostomy tube, and other surgeries associated with the care of severe burns to roughly 23 percent of his body and an associated inhalation injury to his upper airway (R. 274-420).

Mr. Aurand was discharged from the hospital on July 22, 2008 (R. 418-19). The discharge notes indicate that Mr. Aurand has a history of alcohol use and depression and that he was evaluated by psychiatric services while hospitalized on account of the self-inflicted nature of his wounds (*Id.*). Upon discharge, Mr. Aurand was released to Heather Health Care rehabilitation center (R. 419). The admission record from this facility indicates diagnoses of generalized anxiety disorder, depression, a history of alcoholism, and burns (R. 434).

On September 20, 2008, Mr. Aurand received a psychological evaluation from Alan Long, Ph.D., following a referral from the Bureau of Disability Determination ("DDS") (R. 423-25). During the appointment with Dr. Long, Mr. Aurand acknowledged that he was drunk on the day of his suicide attempt (R. 424). Dr. Long observed that Mr. Aurand "was very sociable, verbally expressive and not a whiner. He seemed to be forthright but did not appear to exaggerate his symptoms. There were obvious severe burns on various parts of his body, especially his hands and ears. One of his ears was only partially intact with much of the flesh being gone" (R. 423).

3

Mr. Aurand told Dr. Long that while he was at the nursing facility, he received counseling and alcohol rehabilitation (R. 424). He indicated that his alcohol dependence had been in remission for 14 months, and that he had a pain disorder. He stated: "I'm through with alcohol forever. My mood is good. I have pain all the time. Sometimes it's 7 on a scale of 10. I can't turn my neck. I still have some bleeding from the burn treatment" (*Id.*). Mr. Aurand also complained of having no feeling in half of his fingers (R. 425). Mr. Aurand felt that although he had a good memory and got along well with others, he believed work stress was a problem and that "he worried about everything on the job" (R. 425). In sum, Dr. Long found Mr. Aurand to be oriented and capable of managing his own funds, and he provided a current diagnosis of alcohol dependence (R. 425). Still, Dr. Long opined that it would be "quite awhile for Richard to be physically ready to work. His physical limitations are significant in grasping, turning his head and bending over" (*Id.*).

M.S. Patil, M.D., conducted an Internal Medicine Consultative Examination on September 22, 2008, also at the request of the DDS (R. 429-33). Mr. Aurand reported to Dr. Patil that he was being treated at a nursing home and that he received physical therapy three times a week (R. 429). Mr. Aurand indicated that he felt about 60 percent better, although he still had mild stiffness in his left neck and left arm, as well as mild constant pain in both his arms and palms (*Id.*). He reported mild difficulty getting in and out of the shower, dressing himself, and shaving, and stated that he needed a little help from nurses at the facility to button his shirt or pants (*Id.*). Mr. Aurand also admitted to a history of alcohol abuse for the past 25 years, and stated that his last drink was in July 2008 (*Id.* at 432). Dr. Patil noted that Mr. Aurand had current prescriptions for Sertraline (for anxiety and depression) and Clonazepam (for panic attacks), but that Mr. Aurand was oriented as to time, place, and person, in no distress, and able

to handle funds (R. 429-30). Dr. Patil noted that Mr. Aurand had some difficulty getting on and off the examination table and with squatting (R. 431). He observed grip strength of four on a scale of five, as well as mild difficulty with both hands when turning door knobs and squeezing a blood pressure cuff (R. 432). Finally, Dr. Patel noted some restricted ranges of motion across numerous joints, including the cervical and lumbar spine, shoulders, and knees (R. 431).

Next, the medical record contains eight progress notes from D.L Fortson, M.D., a doctor with whom Mr. Aurand established a relationship prior to his discharge from the rehabilitation center. Dr. Fortson first examined Mr. Aurand on November 20, 2008 (R. 442). At that time, Mr. Aurand told Dr. Fortson that he had numbness and decreased mobility in his hands (*Id.*). He also stated that his depression had improved and that he had stopped drinking (*Id.*). Thereafter, between December 11, 2008 and May 21, 2009, Mr. Aurand had seven additional appointments with Dr. Fortson (R. 435-41). During these appointments, Mr. Aurand complained of itchy, prickly skin, limited range of motion caused by his scarring, and depression (R. 439, 441). Dr. Fortson prescribed Zoloft for Mr. Aurand's depression, Lyrica for pain (R. 439, 441), and also included a diagnosis of an ascending aortic aneurysm (R. 436).

In January 2009, Dr. Fortson referred Mr. Aurand to Community Hospital for occupational therapy (R. 447). At that time, Mr. Aurand's stated functional limitations included an inability to turn his head to drive, an inability to hold items in his left hand, and problems lifting (*Id.*). He rated his pain as a zero on a pain scale of 10 (*Id.*). He reported medications that included Sertraline (*Id.*). Therapy goals included improvement as to cervical and shoulder range of motion, cervical muscles, sitting posture, ability to turn head for driving, and ability in lifting small objects with his left hand (R. 448). Mr. Aurand participated in five therapy sessions and met his short terms goals (R. 449-52).

The next medical record was generated nearly three years later, on October 24, 2011, in the form of handwritten notes from a psychological examination performed by Sudhir Gokhale, M.D. (R. 478-79). Dr. Gokhale's notes indicate that Mr. Aurand considered himself to have been an outgoing young man but that he had become a "nervous wreck" (R. 478-79). Mr. Aurand told Dr. Gokhale that he experienced emotional highs and lows, was unable to sleep or eat properly, and could no longer perform as a machinist/welder/millwright (R. 479). Dr. Gokhale diagnosed Mr. Aurand with bipolar disorder and prescribed Oxcarbazepine, a mood-stabilizing drug (*Id.*).

Subsequent to this single examination, Dr. Gokhale completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("MSS") on Mr. Aurand's behalf on November 8, 2011 (R. 471-73). On this statement, Dr. Gokhale opined that in every category of ability (ranging from the ability to remember locations and work-like procedures, to carrying-out simple instructions, to making simple work-related decisions, to performing or working at a consistent pace, and to responding appropriately to changes in the work setting), Mr. Aurand rated either "fair" or "poor" (*Id.*). Mr. Aurand did not score in either the "excellent" or "good" range for any category of work-related ability. Dr. Gokhale provided a diagnosis of recurring bipolar disorder and also opined that Mr. Aurand would suffer from the same severe mental condition even if he abstained from drug and/or alcohol use (R. 472-73).

Dr. Gokhale followed-up with Mr. Aurand on November 21, 2011 and January 11, 2012 (R. 477, 534). Dr. Gokhale's notes reflect Mr. Aurand's complaints of feeling persecuted ("everybody is out to get me"), feeling nervous around crowds, having no close friends, and not being able to do anything (*Id.*). Dr. Gokhale's notes indicate prescriptions of Mirtazapine and Oxcarbazepine (*Id.*).

Christine Kieffer, Ph.D., evaluated Mr. Aurand on behalf of the DDS on February 23, 2012 (R. 481-83). The examination lasted 45 minutes (*Id.*). Dr. Kieffer observed that Mr. Aurand was neatly dressed and that his speech was logical and coherent (R. 481). Mr. Aurand indicated that he has been a social isolate his whole life, that he quit his job in 2007 to take care of his father (who subsequently died of cancer), and that he attempted suicide in 2008 after feeling despondent about being unemployed (*Id.*). Mr. Aurand stated that this was his only suicide attempt, that he was "depressed and getting drunk all the time," and that he has never been psychiatrically hospitalized (*Id.*). He reported that he spends his time at home watching television and is dependent on his step-mother for assistance with most daily activities, but that he is able to dress and manage personal hygiene (*Id.* at 481-82). He reported that his doctor diagnosed him with bipolar disorder, that he takes Mirtazepine, and that he sees his doctor monthly (R. 482). Mr. Aurand reported current symptoms of depression (R. 482). He described panic upon leaving the house, auditory hallucinations, and some paranoia (*Id.*). He noted a long-standing history of alcohol dependence but stated he had been abstinent since the 2008 suicide attempt (*Id.*).

Dr. Kieffer noted that Mr. Aurand's capacity for attention and concentration was markedly impaired; his fund of general information was poor; he was unable to add, subtract, or multiply; he had an impaired capacity for abstract conceptual reasoning; but that he had a capacity for insight and social judgment that was within normal limits (R. 482). Dr. Kieffer also found Mr. Aurand unable to manage his own funds (*Id.*). She assessed Mr. Aurand with a GAF score of 40 and diagnoses of bipolar II disorder with psychotic features, panic disorder with agoraphobia, borderline intellectual functioning, and personality disorder NOS (not otherwise specified) (*Id.* at 483).

Linda Palacci, D.O., also examined Mr. Aurand on behalf of the DDS on February 23, 2012 (R. 485-88). As part of her Internal Medicine Consultative Examination, Dr. Palacci reviewed the evaluations of Dr. Long and Dr. Patil, and also spent 40 minutes with Mr. Aurand (R. 485). She noted Mr. Aurand's complaints of third degree burns on his neck, thumb and index fingers, chest and back; decreased sensation due to skin grafts; tightness and occasional puritis of the skin; breaks in the skin of his fingers when he tries to bend them; and limited rotation of his neck resulting in an inability to drive (R. 486). Dr. Palacci observed that Mr. Aurand was in no acute distress, could do simple arithmetic, could recall two out of three objects, and had a normal affect (R. 486, 488). She noted that he had skin grafts and scarring of his upper neck, upper back, chest, thumb and index fingers, and right ear (R. 486). Dr. Palacci noted he was able to use his lower extremities normally, that his grip strength was normal, and that he could make fists and oppose fingers, but that he had some range of motion limitations with respect to both shoulders (486-87). She also noted that "[h]e has very poor range of motion of the neck" (R. 487). Dr. Palacci opined that Mr. Aurand could handle funds if granted disability but had a history of depression and poorly controlled hypertension (R. 488).

Towfig Arjmand, M.D., completed a Physical Residual Functional Capacity Assessment of Mr. Aurand on March 8, 2012 (R. 490-97). Dr. Arjmand established exertional limitations of lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking for six hours in an eight-hour workday; sitting about six hours in an eight-hour workday; unlimited pushing/pulling; never climbing; occasional stooping/kneeling/crouching/and crawling; limited overhead reaching; and unlimited handling/fingering/feeling (R. 491-94). Dr. Arjmand found Mr. Aurand's statements of his limitations, including an inability to lift, kneel, hear, and use his

hands, to be "partially credible, [as] they are more severe than what is seen in the medical records" (R. 495).

Glen Pittman, M.D., completed a Psychiatric Review Technique of Mr. Aurand on March 22, 2012, which included a functional capacity assessment (R. 498-515). This assessment took into account the reports of Dr. Gokhale and Dr. Kieffer, and concluded that Mr. Aurand had some moderate limitations with respect to understanding/memory, sustained concentration/persistence, social interaction, and adaptation, but that in many respects he was not significantly limited in these categories (R. 512-13). Dr. Pittman found Mr. Aurand's allegations of limitations to be "overstated" (R. 510). He noted that Mr. Aurand had discontinued Oxcarbazepine and was instead taking Mirtazapine (*Id.*), and that Mr. Aurand "appears to have mild, affective [symptoms] that are [treated] [with a] low dose of [a second] tier antidepressant, not at all typical of what is considered standard [treatment] for bipolar illness" (R. 514). To Dr. Pittman, Mr. Aurand's course of treatment suggested that Dr. Gokhale did not consider Mr. Aurand's illness to be severe (*Id.*). Dr. Pittman also concluded that the clinical evidence did not support a formal thought disorder, and that Mr. Aurand is capable of simple, unskilled work (*Id.*).

Next, the medical record reflects an accident on April 30, 2012, in which Mr. Aurand amputated his left index fingertip while working on a tractor (R. 541). Mr. Aurand received care for this wound at several hospitals.

On July 11, 2012, Marion Panepinto, M.D., completed a Physical Residual Functional Capacity Report on Mr. Aurand's behalf (R. 526-33). Dr. Panepinto established the same functional limitations as Dr. Arjmand, notwithstanding the injury to Mr. Aurand's finger (R. 529). Dr. Panepinto felt that the "laceration to the tip of his left index finger with subsequent

amputation . . . is healing well and he has limited [range of motion] and sensation. Although he may have some limitations currently, this condition is expected to improve in 12 months time and no fine manipulations are expected" (*Id.*).

**C.**

At the hearing before the ALJ on November 9, 2012, Mr. Aurand, Mr. Aurand's step-mother, and a vocational expert ("VE") all testified. Mr. Aurand testified first, and began by describing his work history, which included employment as a millwright and machinist (R. 43-45). He stated that he has not worked since 2007, when he left his job to take care of his ailing father (R. 43). Mr. Aurand stated that he tried to get a job with a "temp" agency in 2012, but that he was not able to pass the physical, so the company did not hire him (R. 54). Later in the hearing, Mr. Aurand testified that he worked during the summer of 2012 for about a month before he was laid-off (R. 104). His job was to run a machine called a Bridgeport, but that he kept making the wrong parts and breaking things and so he was let go (R. 105). He stated that he still tries every so often to get a job but that he knows he is not going to get anything (R. 105).

Mr. Aurand currently lives with his step-mother in an apartment and provides a small amount of assistance around the home. He tries to pick things up for her but mostly lies in bed watching television (R. 47, 76). He eats dinner at home and occasionally microwaves a meal (R. 49). He does not go anywhere other than to his sister's house to watch over his young nephew after school (R. 47-48). He does not feed his nephew, or do homework with him, or play with him; rather, he just makes sure the home is secure for a few hours each afternoon (R. 48). Mr. Aurand denied ever going shopping, doing laundry, mowing the lawn, engaging in any hobbies, volunteering, or attending any religious or social groups (R. 51-52). He denied doing any repairs

around the house, going on trips, or having any close relationships other than with one friend who comes over every two months (R. 53). He denied knowing how to use a computer (R. 54).

Mr. Aurand received treatment at numerous hospitals in both Illinois and Indiana after severing the tip of his left index finger in April 2012 (R. 58, 67-68). Initially, Mr. Aurand stated that he injured his finger when he tried to move a steel plate he found lying in the grass near his step-mother's apartment (R. 59). However, Mr. Aurand later testified that he severed the fingertip in Indiana while helping a friend with a tractor (R. 64). Mr. Aurand also testified that he is limited physically by his inability to turn his head due to scar tissue from his burns (*Id.*). He denied ever being hospitalized for depression or other mental health condition, or for any reason aside from his burn injury (R. 62-63). Mr. Aurand currently is receiving treatment for depression (R. 45). He sees his doctor (whose name he could not recall) every few months (R. 46). His step-mother makes the appointments for him and provides transportation (*Id.*).

Mr. Aurand has not driven since 2006 and no longer has a valid license (R. 70). He stated that he has been unable to renew his license since an arrest for driving under the influence of alcohol (R. 70-71). He admitted that he still drinks alcohol; he had two cans of beer about a week before the hearing, and also drank about four or five weeks before the hearing, resulting in unruly behavior that led to his sister calling the police (R. 73-74). He attended an alcohol rehabilitation program after his DUI, but not since then (R. 73).

Mr. Aurand takes Tylenol twice a day to control the pain stemming from the injury to his finger (R. 58). He also stated that he takes medication at night for depression or anxiety, but that he sometimes forgets to take it (R. 76-77). He takes no other medications (R. 77). Dr. Gokhale is his prescribing physician, and they meet for about 20-30 minutes at a time (R. 79). Dr. Gokhale has not recommended that Mr. Aurand also see a therapist or counselor (*Id.*).

When asked whether he has difficulties dressing, Mr. Aurand stated that sometimes he struggles with his clothing, and that his shoulders bleed occasionally due to the skin grafts and burns (R. 79). He has no trouble managing his personal hygiene (R. 79-80). He stated that he can feel with his thumbs but not with his left index finger, and that part of his palm is numb (R. 82). When he raises his arms above his head, his skin cracks and bleeds (*Id.*). Because of the scar tissue on his neck, he is unable to turn his head and thus has to turn his body sideways to look up (R. 83). He can walk about a block but then needs to sit and rest (*Id.*). He has trouble breathing at times and gets bronchitis but has not had to go the emergency room for this problem (R. 84). He thinks he could stand for about an hour but does not often stand for more than five to 15 minutes (R. 85). He stated that he could not stand for six hours at a job because his back and neck would start hurting (R. 86). He is unable to concentrate for more than an hour or two at a time and spends more than half of the day lying down because he is depressed, bored, and in pain (R. 86-87).

Mr. Aurand's step-mother, Jean Marie Aurand, testified next. She stated that Mr. Aurand lives with her, although she also has two daughters, Bonnie, who lives close by, and Jennifer, who lives in Indiana (R. 90). Mrs. Aurand stated that Mr. Aurand does not go with her on trips to Jennifer's home because he prefers to be at his own home and does not like socializing (*Id.*). Mrs. Aurand also described the nature of Mr. Aurand's after-school oversight of Bonnie's son and daughter (R. 91). Mrs. Aurand explained that her step-son arrives at Bonnie's home each afternoon "to make sure that [the kids] feel safe," and that he "putzes in the garage . . . and cleans up her garage or rakes . . . the leaves" (*Id.*). Mrs. Aurand stated that while she frequently drives to Bonnie's house to prepare dinner, Mr. Aurand prefers to walk between his apartment and Bonnie's home (R. 92). Although he has reliably shown up at Bonnie's home (albeit with

12

daily reminders from his step-mother), Ms. Aurand stated that he once left the children alone while he walked to the grocery store to get a pizza (R. 103).

Mrs. Aurand stated that her step-son does not help around the house very much aside from doing the dishes and washing his own clothes occasionally (R. 94). She indicated that he goes to Dr. Gokhale once every four months or so, and that she drives him to his appointments (R. 94-95). She reminds him to take his medications (R. 103). As for her step-son's work history, Mrs. Aurand stated that he worked for a couple of months as a machinist, but that he got laid off (R. 95). She elaborated that Mr. Aurand has a resume that was posted on-line with the help of Bonnie's teenage daughter, and that he filled-out a job application at a grocery store, but that nothing has come of these efforts (R. 99).

Finally, Vocational Expert ("VE") Edward Pagella testified. He classified Mr. Aurand's former employment as a follows: lathe machine operator—semi-skilled, medium-level work; millwright—skilled, heavy-level work; paint mixer—semi-skilled, heavy-level work; drill-press operator—semi-skilled, medium-level work (R. 107-08). The ALJ then posed the following hypothetical to the VE: assuming an individual lifting up to 20 pounds occasionally and 10 pounds frequently; standing or walking for six hours out of an eight hour workday and sitting for six hours of an eight hour work day; cannot climb ropes, ladders, or scaffolds; can occasionally stoop, kneel, crouch and crawl; can frequently reach above shoulder level with both arms; should not perform repetitive twisting motions of the neck; can perform simple, routine, repetitive tasks; is able to understand, remember, and carry out simple instructions; can occasionally make decisions; can occasionally interact with crowds and the public; can interact frequently with coworkers; can occasionally interact with supervisors; should not be required to read complex instructions or write complex or extensive reports; should not be required to perform complex

mathematical calculations but can perform simple mathematical calculations—would such a hypothetical worker be able to perform Mr. Aurand's past work? (R. 109-10). The VE responded in the negative (R. 110). The ALJ then asked whether such a hypothetical worker could perform other jobs in the regional or national economy, and to this question the ALJ responded affirmatively—that the worker could perform the job of hand packer, assembler, or hand sorter (R. 111). When the ALJ added the limitation that the hypothetical individual could frequently finger with the left non-dominant hand, no limitation with the right hand, and occasionally feel with both hands, the VE responded that the individual could not perform the three identified jobs because the ALJ had eliminated the individual's ability to use both of his upper extremities (R. 111). The VE explained that the individual could do the identified jobs provided he had "frequent utilization of the bilateral upper extremities" (R. 112).

### D.

On November 30, 2012, the ALJ issued a 13-page, single-spaced written opinion finding Mr. Aurand not disabled pursuant to sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act and consequently denying him benefits (R. 20-32). In evaluating the claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not meet or equal one of the listed impairments, she must assess and make a finding about the claimant's Residual Functional Capacity ("RFC") before moving on to Step 4. *See* 20 C.F.R.

§ 404.1520(e). The ALJ then uses the RFC at Step 4 to determine whether the claimant can return to his past relevant work; if not, the ALJ proceeds to Step 5 to determine whether the claimant can return to different available work in the national economy. *See Id.* at § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ found that Mr. Aurand has not engaged in substantial gainful employment since his alleged onset date of February 16, 2011 (R. 22).[2] At Step 2, she found that Mr. Aurand's status post burn injury, status post skin grafts, bipolar disorder, and history of substance abuse qualified as severe impairments (*Id.*). The ALJ did not find Mr. Aurand's missing left fingertip sufficiently disabling to qualify as a severe impairment (R. 23). At Step 3, the ALJ found that these impairments did not meet or medically equal any of the impairments listed in the Listing of Impairments (R. 23-24). The ALJ then found that Mr. Aurand had an RFC that permitted him to perform light work with various modifications (R. 25). At Step 4, the ALJ found that Mr. Aurand could not perform his past relevant work (R. 30), but at Step 5 the ALJ found that there was other work Mr. Aurand could perform (R. 31). Accordingly, the ALJ found Mr. Aurand not disabled.

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*,

---

[2] The ALJ found that Mr. Aurand had worked after the alleged onset date but characterized the work as an unsuccessful job attempt (R. 22).

357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Mr. Aurand contends that the ALJ's determination contained four critical errors: first, she failed to determine whether the combination of his impairments met or equaled a listing; second, she incorrectly assessed his credibility; third, she failed to properly formulate his RFC; and fourth, she did not include in the hypotheticals presented to the VE Mr. Aurand's impairments relative to attention, concentration, and pace (Pl.'s Mem. in Supp. Mot. Summ. J. ("Pl.'s Mem.") at 9-10, 12, 14). For the reasons stated below, the Court disagrees with each of these challenges.

## A.

Mr. Aurand first argues that the ALJ inadequately assessed whether he met or equaled a listing in violation of 20 C.F.R. § 404.1526(b). Specifically, Mr. Aurand suggests that the ALJ considered all of his impairment "*seriatim*" instead of in combination, and that this error is embodied by the following statement contained in the ALJ's decision: "The Claimant testified that he sometimes has difficulties in personal grooming, but that is due to his skin grafts, not mental impairments" (R. 23; Pl.'s Mem. at 9). Mr. Aurand maintains that the ALJ should have considered his skin grafts and mental impairments together and should have considered listings pertaining to soft tissue injuries (1.08); burns (8.00C, 8.00F, 8.08); affective disorders (12.04); and anxiety related disorders (12.06) (*Id.* at 9-10; Pl.'s Reply at 1-2). The Commissioner

responds to this assertion by stating that Mr. Aurand bore the burden of establishing a disability under the Listings, and that he failed to carry this burden of proof or to identify how the ALJ's alleged error was harmful to his claim of disability (Def.'s Mem. in Supp. Mot. Summ. J. ("Def.'s Mem.") at 3-4).

20 C.F.R. § 404.1526(b)(3) provides as follows: "If you have a combination of impairments, no one of which meets a listing (see § 404.1525(c)(3)), we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing." As the claimant, Mr. Aurand "bears the burden of proving his condition meets or equals a listed impairment." *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999); *see also Sullivan v. Zebley,* 493 U.S. 521, 530 (1990) ("for a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria") (emphasis in original).

The ALJ stated in her opinion that she considered all of the listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that she paid close attention to listings 1.08, 8.00C, 8.00F, and 8.08, but that "the medical evidence does not document listing-level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination" (R. 23). The ALJ noted that Mr. Aurand's "burns do not result in very serious limitations, as he was able to look for work, rake leaves, attempt to fix a tractor, work at a medium position full-time for two months, do laundry, wash dishes and clean a garage" (*Id.*). As for Mr. Aurand's mental health condition, the ALJ found that Mr. Aurand's condition does not meet the criteria of listings 12.04 and 12.06, and in support of this finding discussed Mr. Aurand's abilities with respect to his activities of daily living,

social functioning, and concentration, persistence, or pace (*Id.*). In each of these categories, the ALJ noted what Mr. Aurand was able to do, including watching over his niece and nephew, posting a resume on-line, and doing his own laundry (R. 24).

We find no error with the ALJ's analysis. Mr. Aurand focuses on the ALJ's statement that Mr. Aurand's difficulties in personal grooming were the result of "skin grafts, not mental impairments." However, we fail to see any error in this statement. Mr. Aurand testified at the hearing that he does not have any trouble with his personal grooming (R. 79-80), except that the skin on his shoulders, face, and back bleed because his "skin is so dried out that it just cracks and it bleeds" (R. 82). By his own testimony, Mr. Aurand's grooming problems stem from the fragile nature of his burned skin. Mr. Aurand did not testify that he has trouble with grooming, in whole or in part, as a consequence of his state of mind; for instance, lingering depression or anhedonia that disrupts his grooming regimen. Accordingly, the Court is not persuaded by Mr. Aurand's undeveloped argument on appeal that the ALJ should have addressed his impairments in combination rather than *seriatim*. We find no reversible error in the ALJ's conclusion that Mr. Aurand's severe impairments "do not meet the criteria of any listed impairment" (R. 23).

## B.

Next, Mr. Aurand contends that the ALJ improperly discredited his testimony. Within this argument, Mr. Aurand also maintains that the ALJ gave improper weight to his activities of daily living and improperly relied on objective medical evidence to discredit him (Pl.'s Mem. at 10-12). In response, the Commissioner argues that the ALJ fully explained her reasons for finding Mr. Aurand's allegations to be unreliable (Def.'s Mem. at 4).

In assessing a claimant's credibility when the allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms

are supported by medical evidence. *See* SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. 1996); *Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96–7p). "The ALJ should look to a number of factors to determine credibility, such as 'the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (citing 20 C.F.R. § 404.1529(c)(2)-(4)).

Administrative law judges are in the best position to evaluate a witness's credibility, and their assessment will be reversed only if "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). This means that the Court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and that Mr. Aurand "must do more than point to a different conclusion that the ALJ could have reached." *See Jones v. Astrue,* 623 F.3d 1155, 1162 (7th Cir. 2010). Still, an ALJ must connect her credibility determinations by an "accurate and logical bridge" to the record evidence. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006); *see also Sayles v. Barnhart,* No. 00 C 7200, 2001 WL 1568850, at *7 (N.D. Ill. Dec. 7, 2001) (Schenkier. J.) (finding a particular need to establish logical bridge in credibility determinations).

In this case, the ALJ gave numerous reasons in support of her finding that Mr. Aurand's testimony was only partially credible. To begin with, she noted multiple inconsistencies between Mr. Aurand's hearing testimony and testimony provided by his step-mother. For instance, Mr. Aurand stated that he does not often help out around the house, does not do laundry, does not

mow the lawn, does not go to the store, walks to his sister's house only "once in a while," and does not do any repairs around the house. His step-mother, however, testified that Mr. Aurand cleans the garage, rakes leaves at his sister's house, occasionally does dishes and his own laundry, recently went to the grocery store to pick up a pizza, and walks the several blocks between his home and his sister's on a daily basis.

The ALJ also noted internal inconsistencies with respect to Mr. Aurand's own hearing testimony, most notably as to the injury he sustained to his left index finger, and as to his most recent job. Mr. Aurand initially stated that he severed his fingertip while picking up a metal disk on the ground near his home, but later in the hearing admitted that he severed the fingertip in Indiana while trying to help a friend fix a tractor. Mr. Aurand also initially downplayed the extent of his most recent effort at employment—stating at first that he tried to get a temporary job but that he could not pass the required physical—but later admitted (after his step mother testified that he had worked as a full-time machinist for two months) that he was employed for a time and then terminated from his job because he kept making mistakes.[3]

Additionally, the ALJ noted inconsistencies between the medical record and Mr. Aurand's allegations of severe physical and mental health limitations stemming from his burns, grafts, and bipolar disorder. The ALJ noted that Mr. Aurand has received infrequent mental health treatment; in fact, the record reflects just three visits with Dr. Gokhale (whose role was to prescribe and manage Mr. Aurand's medication) and no counseling or therapy sessions. Further, the ALJ noted an absence of documentation—including Dr. Gokhale's records—supporting Mr. Aurand's complaint to Dr. Kieffer that he suffers from hallucinations. The ALJ

---

[3]During the hearing, Mr. Aurand submitted a document that was labeled as his last pay check (Exh. 18 F, R. 26, 572). This check reflected payment of $15.00 per hour, 372 year-to-date hours worked, and wages earned of $5,925.00.

noted that Mr. Aurand now takes a single medication for his condition (Mirtazapine, which is for depression), and that various consultative examiners observed Mr. Aurand to be fully oriented, socially appropriate, and cooperative during their examinations. The ALJ noted that Mr. Aurand voluntarily stopped working to care for his father well in advance of his disability onset date, and that Mr. Aurand was employed (albeit briefly) subsequent to his disability onset date. The ALJ noted that consultative examiners found Mr. Aurand capable of many physical tasks such as normal walking, normal strength in both upper and lower extremities, and normal range of motion of the hips, knees, and ankles—findings that are at odds with Mr. Aurand's hearing testimony that he could not walk more than a block, do household chores, or venture out to the store alone.

Mr. Aurand does not agree with these assessments, asserting that the ALJ discredited him based on "minor inconsistencies." However, we find that the ALJ supported her decision with many examples of inconsistencies that, taken as a whole, she was entitled to deem as more than trivial. We also find no merit to Mr. Aurand's assertion that the ALJ improperly equated his activities of daily living with an ability to work fulltime. While cognizant of the Seventh Circuit's directive that "[a]n ALJ may not ignore a claimant's limiting qualifications with regard to h[is] daily activities," *Jones v. Astrue,* 623 F.3d 1155, 1162 (7th Cir. 2010), we find in this case that the ALJ considered Mr. Aurand's alleged limitations and found them lacking in veracity. *See Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) ("An ALJ may disregard a claimant's assertions of pain if he validly finds her incredible"). Because the ALJ reasonably supported her finding that Mr. Aurand was not fully credible, this Court cannot conclude that the ALJ's credibility determination was patently wrong.

Mr. Aurand also contends that the ALJ erroneously concluded that the various examinations with consultative examiners were "inconsistent at best" (Pl.'s Mem. at 11). Mr. Aurand maintains that the psychological examination of Dr. Christine Kieffer—who found in February 2012 that Mr. Aurand was unable to perform simple arithmetic, had a markedly impaired capacity for attention and concentration, and a somewhat impaired capacity for abstract conceptual reasoning—should not have been held up against and contrasted with the physical examination by Dr. Liana Palacci, who found Mr. Aurand to have a normal affect and able to perform simple arithmetic. He maintains that Dr. Kieffer's examination should prevail over those of other examiners because she is a psychologist, while Dr. Palacci was retained to give a physical health consultative examination and gave Mr. Aurand only a cursory mental status examination.

The ALJ was not required to give greater weight to Dr. Kieffer's examination than to Dr. Palacci's because both doctors are non-treating source providers. A non-treating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. The ALJ is entitled to evaluate a non-treating opinion and afford it certain weight in light of various factors, but is not required to assign controlling weight to it. *See* 20 C.F.R. § 416.927(c); 20 C.F.R. § 404.1527(c); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). These factors include how well the non-treating physician supported and explained his opinion, whether his opinion is consistent with the record as a whole, whether he is a specialist in the field of the claimant's impairments, and any other relevant factors of which the ALJ is aware. 20 C.F.R. § 416.927(c).

The ALJ discounted Dr. Kieffer's findings that Mr. Aurand had a GAF score of 40, indicating major impairments in several areas, and gave her opinion only "slight weight," concluding that "[t]here is no medical evidence to support this conclusion other than the claimant's own statements during the interview, of which I do not give great credibility"[4] (R. 29) The ALJ found no medical evidence to support Dr. Kieffer's conclusion that Mr. Aurand suffered major impairments in several areas, and noted that even Dr. Gokhale assessed a GAF score of 50. The ALJ noted that while Mr. Aurand told Dr. Kieffer that he suffered from auditory hallucinations, could not perform basic math, and was dependent upon his step-mother for activities of daily living, Dr. Palacci found Mr. Aurand capable of simple arithmetic. Further, testimony elicited during the hearing indicated that Mr. Aurand was not completely dependent upon his mother for basic daily tasks. These inconsistencies, the ALJ explained, eroded her confidence in Dr. Kieffer's opinion. We find that the ALJ's gave sufficient reasons for according slight weight to the opinion of Dr. Kieffer, including her GAF score of 40, and in concluding that the results of consultative examiners were inconsistent.

Mr. Aurand makes one additional argument that merits little discussion. He contends that the ALJ noted "[t]he claimant no longer receives treatment for his burns," yet failed to ask him

---

[4]The GAF score is a numeric scale ranging from 0-100 that was used by the American Psychiatric Association to assess the severity of symptoms and functional level. *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000). A GAF score of 41–50 correlates with "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 32. However, the Court notes that the fifth edition of the *Diagnostic & Statistical Manual of Mental Disorders*, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see also Williams v. Colvin,* 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012). We note as well that even before the American Psychiatric Association discredited GAF scores, at no time did "the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotations omitted); *see also Curry v. Astrue,* No. 3:09–CV–565 CAN, 2010 WL 4537868, at *7 (N.D. Ind., Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability."); *Denton,* 596 F.3d at 425 (GAF scores do "not reflect the clinician's opinion of functional capacity").

why this was the case (Pl.'s Mem. at 11). However, the ALJ specifically asked Mr. Aurand to describe the treatments he was receiving at the time of the hearing, and Mr. Aurand replied: "depression" (R. 45). The ALJ then asked: "[a]nything else?" to which Mr. Aurand responded: "[n]o, that's about it right now" (R. 45-46). We are hard-pressed to understand how the ALJ failed to sufficiently inquire into Mr. Aurand's current conditions given the responses Mr. Aurand provided.

## C.

Mr. Aurand next argues that the ALJ failed to consider Dr. Gokhale a treating source physician whose opinion was entitled to great weight and that, as a consequence of this failure, the ALJ improperly assessed his RFC (Pl.'s Mem. at 12). We address each of these arguments in turn.

## 1.

As noted above, a treating source is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Conversely, a non-treating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." *Id.* The ALJ concluded that Dr. Gokhale was not a treating source at the time he completed the Medical Sources Statement of Ability to Do Work-Related Activities (Mental) ("MSS") on Mr. Aurand's behalf because at that time, Dr. Gokhale had seen Mr. Aurand only once (R. 29). We find no error with this determination. Dr. Gokhale's single appointment with Mr. Aurand prior to filling out the MSS failed to give rise to a treating source relationship because the examination was insufficient to establish a longitudinal record of Mr.

24

Aurand's impairments. *See* 20 C.F.R. § 404.1527(c)(2)(i) (stating that "[w]hen the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight"). Although two additional appointments occurred within the next few months, most relevant to our review is whether Dr. Gokhale was a treating source physician when he completed the MSS. The ALJ did not err in concluding that he was not.

Because Dr. Gokhale was thus a non-treating source, the ALJ was not required to assign his opinion controlling weight; rather, the ALJ was permitted to evaluate the weight to be given that opinion pursuant to other regulatory factors. *See Simila,* 573 F.3d 504, 514 (S.D. Ind. 2015); *see also* 20 C.F.R. § 416.927(c)(1)-(6). These factors include the claimant's examining and treatment relationship with the source of the opinion; the physician's specialty; the support provided for the medical opinion; its consistency with the record as a whole; and any other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 416.927(c)(1)-(6); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010). If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ "'minimally articulate[d]' his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice v. Barnhart,* 384 F.3d 363, 372 (7th Cir. 2004)).

In her ruling, the ALJ explained that she minimized the weight given Dr. Gokhale's opinion because it was based on only one examination (R. 29). She further noted that Dr. Gokhale's "opinion is on a form with very little detail, and has no reasoning to support his opinion. It is conclusory and is not supported by his notes, which only report the claimant's subjective complaints" (*Id.*). We find that the ALJ minimally articulated her reasons for

discounting Dr. Gokhale's report. While brief, the ALJ's discussion satisfied the requirements of 20 C.F.R. § 416.927 by discussing the frequency of the treatment relationship, the supportability of the opinion (meaning relevant evidence included in the opinion that supports the findings), and the fact that the opinion is on a form that contains very little detail. *See Simila*, 573 F.3d at 515 (affirming ALJ's decision not to give a non-treating physician controlling weight where the ALJ considered consistency and supportability—two of the requisite factors listed in Section 416.927(c)); *Minor v. Colvin*, No. 1:14-cv-00444-SEB-MJD, 2015 WL 2193771, at *5 (S.D. Ind., May 11, 2015) (same); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (explaining that a check-box form "might be weak evidence" unless supported by medical records).

2.

We turn now to the ALJ's assessment of Mr. Aurand's RFC. The ALJ determined that Mr. Aurand has the RFC to perform light work with physical modifications that included limitations against more than frequent lifting overhead and complete restrictions against repetitive twisting motions of the neck (R. 25). Mr. Aurand maintains that the ALJ failed to include in the RFC his reduced sensitivity to touch on his thumbs and index fingers, reduced strength and range of motion in his shoulders and neck, and reduced arm and grip strength (Pl.'s Mem. at 14). The Commissioner responds that the ALJ did not ignore any relevant limitations, that Mr. Aurand relies on older evidence dating back to 2008 when he sustained his burns, and that Mr. Aurand's ability to work in 2012 demonstrates that his injuries were not functionally limiting (Def.'s Mem. at 9).

The ALJ stated that she did not accommodate all of Mr. Aurand's claimed symptoms and limitations because she found his allegations not fully credible. Regarding finger sensitivity,

26

the ALJ noted that Mr. Aurand testified during the hearing that he could feel with his thumb and fingers except for his severed finger.[5] Regarding the severed fingertip, the ALJ noted that aside from the emergency room visits following the tractor accident, the medical record is devoid of additional physical exams pertaining to this finger. Furthermore, the ALJ noted that Dr. Liana Palacci's February 2012 examination of Mr. Aurand indicated normal grip strength, the ability to make a fist and oppose fingers, shoulder range of motion of 130/150 in flexion, 40/40 in extension, 130/150 in abduction, 30/30 in adduction, 80/80 in internal rotation, and 80/90 in external rotation. Dr. Palacci also noted strength of the upper extremities to be 5/5.[6] Finally, the ALJ found that Mr. Aurand's testimony undermined the strength of his own claim: Mr. Aurand admitted that he worked for approximately two months after the start of his alleged disability onset date, and that he was let go from his job because he made mistakes running a milling machine.

We find no error with the ALJ's determination. Although the testimony is somewhat unclear regarding the extent of Mr. Aurand's touch sensitivity limitations, it is safe to say that he experiences some loss of sensation on his index fingers and thumbs due to skin grafts. That being said, Mr. Aurand failed to present evidence supporting his claim that the grafts on his hands, plus his missing left fingertip, preclude any and all substantial gainful employment. *See Maestas v. Astrue*, No. 10-cv-01114-CMA, 2011 WL 1100138, at *7 (D. Colo., Mar. 23, 2011) (impairments included partially amputated fingers and related complaints of difficulty holding

---

[5]Mr. Aurand testified, somewhat confusingly: "I can feel with my thumbs but I can't feel with this index finger and this one no more because it's severed. I can feel with these fingers. And part of my palm is numb. This one, the left hand's okay, I can feel with my left hand. But my right hand I've—that's the only hand that I've got good that I can grab things with" (R. 82).

[6]Dr. Palacci also noted that Mr. Aurand could hold coins, turn doorknobs, button shirts and tie shoelaces, but that he has decreased sensation to light touch and pinprick at the areas of the skin grafts (R. 486-87). Dr. Palacci noted that Mr. Aurand has skin grafts on both thumbs and index fingers, neck, chest, upper back, and right ear (R. 486).

things did not prelude all gainful employment). Outside of the context of his disability claim, Mr. Aurand did not report to medical providers that he experienced significant symptoms or limitations stemming from the partial amputation of the left index finger. Moreover, he is right-handed dominant, and Dr. Palacci's examination indicated an ability to grip normally and manipulate objects such as coins, buttons, and door knobs. Further, Mr. Aurand was able to work for approximately two months in the summer of 2012 before he was let go for making mistakes. Mr. Aurand did not testify that he was let go from his employment because he was physically unable to handle the job; for instance, because he could not feel the machine properly on account of his fingers, or because his hands were weak, or because he could not properly turn his neck. We note as well that Mr. Aurand retained the vigor and dexterity to work on a friend's tractor, rake leaves in his sister's yard, and "putz" around in the garage at his sister's home, again suggesting arm strength and manual dexterity. Finally, Mr. Aurand's step-mother testified that she paid to have Mr. Aurand's resume prepared, and that his niece then posted the resume online, again suggesting that Mr. Aurand felt he had the capacity for some type of employment. The ALJ's reliance on these facts when assessing Mr. Aurand's RFC created a logical bridge between the evidence and her conclusion that Mr. Aurand is able to do light work with physical limitations supported by documented neck and shoulder impairments.

Mr. Aurand argues that the ALJ demonstrated a failure in logic when she discredited the GAF scores of Drs. Gokhale and Kieffer, and in fact used the higher GAF score of 50 provided by Dr. Gokhale—whose opinion the ALJ gave "very little weight"—to discredit the lower GAF score of 40 provided by Dr. Kieffer (Pl.'s Mem. at 14). This argument lacks merit. As discussed above, neither Dr. Gokhale nor Dr. Kieffer was a treating source physician; thus, the ALJ was not required to give controlling weight to their opinions. We need not repeat that analysis again

here, or discuss again the limited value of GAF scores. *See* footnote 4, *infra*. We note as well that the ALJ accommodated Dr. Gokhale's bipolar diagnosis (which Dr. Kieffer seemed to have adopted) by limiting Mr. Aurand to simple, routine, repetitive tasks, among other limitations, notwithstanding the lack of objective medical evidence underlying the bipolar diagnosis.[7] We view the ALJ's discussion regarding Dr. Gokhale's and Dr. Kieffer's GAF scores as an attempt by the ALJ to highlight her reasons for assigning Dr. Kieffer's report only "slight weight." We find no failure of logic.

## D.

Finally, Mr. Aurand contends that the ALJ's hypothetical questions to the VE were inadequate because she failed to include limitations as to concentration, persistence, and pace, or as to attention and concentration. The ALJ's hypothetical to the VE with respect to mental limitations was as follows: the individual is able to understand, remember, and carry out simple instructions; can occasionally make decisions; can occasionally interact with crowds and the public; can interact frequently with coworkers; can occasionally interact with supervisors; should not be required to read complex instructions or write complex or extensive reports; should not be

---

[7] A diagnosis of bipolar disorder "hinges on [the patient] having periods of unusual elevation or irritability in mood that are coupled with increases in energy, sleeplessness, and fast thinking or speech. The patient's symptoms are fully assessed using specific criteria from the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* or DSM-IV." http://www.webmd.com/bipolar-disorder/guide/bipolar-disorder-diagnosis. According to the Mayo Clinic website, when a doctor suspects a diagnosis of bipolar disorder, she may order a physical exam and blood tests to help identify any medical conditions that may be causing symptoms, may have the patient fill out a psychological self-assessment or questionnaire, may have the patient fill out a mood chart, and may interview friends and family to gather information about episodes of depression or mania. www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/tests-diagnosis/con-20027544. A close review of Dr. Gokhale's notes from his October 24, 2011 examination of Mr. Aurand (the only examination that played a part in Dr. Gokhale's MSS) reveals that the doctor memorialized Mr. Aurand's statements as to his feelings (anxiety, sleeplessness, lack of appetite), statements about his family (parents unhappily married, father a "miserable" man), and details about Mr. Aurand's suicide attempt following a night of drinking, but did not administer any diagnostic tests or indicate a need to gather more information regarding Mr. Aurand's moods, or seek to review any other medical records as a way of lending support to the bipolar diagnosis and attendant prescription of Oxcarbazepine, which is a mood-stabilizing drug.

required to perform complex mathematical calculations but can perform simple mathematical calculations.

An ALJ's RFC assessment and the hypothetical posed to the VE must incorporate all of the claimant's limitations supported by the medical record. *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010)); *see also Indoranto v. Barnhart,* 374 F.3d 470, 473-74 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record"). That includes any deficiencies the claimant has in concentration, persistence, or pace. *Yurt,* 758 F.3d at 857; *O'Connor–Spinner,* 627 F.3d at 619 ("Among the limitations the VE must consider are deficiencies of concentration, persistence, or pace"); *Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir. 2009) (indicating the hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'") (collecting cases).

The most effective way to ensure that the VE is fully apprised of the claimant's limitations is to include them directly in the hypothetical. *O'Connor–Spinner,* 627 F.3d at 619. That being said, the ALJ need not explicitly state the words "concentration, persistence, or pace" when it is clear that "the ALJ's phrasing specifically excluded tasks that someone with the claimant's limitations could not perform." *Marley v. Colvin,* No. 1:14-cv-157, 2015 WL 39999484, at *5 (N.D. Ind., July 1, 2015). That is also true when, as is relevant here, a medical expert found that the claimant could perform unskilled work notwithstanding limitations in concentration, persistence, and pace. *See Milliken v. Astrue,* 397 Fed. App'x 218, 222 (7th Cir. 2010) (ALJ's hypothetical to the VE that limited the claimant to unskilled work but did not include limitations in concentration, persistence, and pace was adequate where the hypothetical

incorporated the medical expert's assessment that the claimant could perform unskilled work); *Calhoun v. Colvin,* No. 1:12-CV-00204, 2013 WL 3834750, at *10 (N.D. Ind., July 24, 2013) (upholding a hypothetical to a VE where the ALJ did not include a limitation in concentration, persistence, and pace but relied almost verbatim on a medical expert's RFC); *see also Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record").

In this case, the ALJ's hypothetical to the VE limited the claimant to simple, routine, and repetitive tasks but did not specifically include the phrase "concentration, persistence, and pace." We do not find this omission to be reversible error. State psychological consultant Dr. Glen Pittman provided the sole mental residual functional capacity assessment of record as to Mr. Aurand—an assessment that included findings that Mr. Aurand had some moderate limitations with respect to carrying out detailed instructions, to maintaining attention and concentration throughout the work day, and to completing a normal workday and workweek without interruptions from psychologically-based symptoms. The ALJ discussed and gave great weight to Dr. Pittman's findings, especially the doctor's observation that Mr. Aurand had "mild affective symptoms" not suggestive of a formal thought disorder, that Mr. Aurand was taking an antidepressant that was "not at all typical of what is considered standard [treatment] for bipolar illness," and that Mr. Aurand was able to do simple, unskilled work. Given the ALJ's reliance on Dr. Pittman's report in her determination, the absence of any other mental RFC in the medical record, and the ALJ's adoption of mental limitations that closely follow those stated by Dr. Pittman, common sense dictates that the ALJ relied upon Dr. Pittman's report when formulating her hypothetical to the VE. *See Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (finding that where only one medical expert made an RFC determination, the ALJ reasonably

relied upon this expert's opinion in formulating the hypothetical to the VE); *see also Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000) (explaining that courts apply "commonsensical" reading to ALJ opinions rather than scrutinizing them for minor errors or inconsistencies).[8]

Nor are we troubled by the difference in wording between the ALJ's hypothetical question restricting the individual to "simple, routine, and repetitive tasks" and Dr. Pittman's opinion that Mr. Aurand could partake in "simple, unskilled work." "Unskilled work" is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a); *see Jelinek,* 662 F.3d at 813-14. Social Security Regulation 96-9p provides that the following mental activities are generally required to perform unskilled work: understanding, remembering, and carrying out simple instructions; making simple work-related decisions; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. SSR 96-9p, 1996 WL 374186, at *9 (July 2, 1996); *Craft v. Astrue,* 539 F.3d 668, 677 (7th Cir. 2008). Accordingly, we find that the ALJ adequately addressed Mr. Aurand's moderate limitations as to concentration, persistence, and pace by relying on Dr. Pittman's opinion. The ALJ's opinion is

---

[8]The facts of this case are distinguishable from the Seventh Circuit's recent decision in *Varga v. Colvin,* -- F.3d --, No. 14-2122, 2015 WL 4488346 (7th Cir., Jul. 24, 2015), wherein the Court found that the ALJ committed reversible error by failing to include in the hypothetical question posed to the VE the claimant's moderate limitations as to concentration, persistence and pace. There, a state agency psychological consultant named Dr. Rattan noted in his Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms that the claimant had many moderate-level limitations; however, the doctor's summary conclusions with respect to these limitations (if one ever existed at all) were transferred to an electronic worksheet but then subsequently lost. *Id.* at *1-2. Under these circumstances, the Court felt the ALJ should have included in the hypothetical to the VE the numerous limitations identified by Dr. Rattan. *Id.* at *4. Because the ALJ failed to do so, the Court concluded that the ALJ neglected to pose a hypothetical to the VE that incorporated all of the claimant's medically-supported limitations. *Id.* In this case, by contrast, Dr. Pittman summarized his findings as to Mr. Aurand's concentration, persistence, and pace limitations and concluded that Mr. Aurand could perform simple, unskilled work. This RFC assessment was not lost from the record, and the ALJ was then able to adopt it and incorporate it into the hypothetical posed to the VE and, ultimately, into Mr. Aurand's RFC. As discussed above, this was a permissible way for the ALJ to account for Mr. Aurand's moderate limitations as to concentration, persistence and pace. *See Milliken,* 397 Fed. App'x 221-22; *Johansen,* 314 F.3d at 288-89.

sufficiently clear to allow this Court to trace a path from Dr. Pittman's opinion to the ALJ's determination that Mr. Aurand is able to perform simple, unskilled work.

## CONCLUSION

For the reasons set forth above, the Court denies Mr. Aurand's motion for summary judgment (doc. # 13) and grants the Commissioner's motion for summary affirmance (doc. # 19). The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated:  July 31, 2015**